## Case No. 5,227.

### GARDNER et al. v. GARDNER et al.

[3 Mason, 178.] [1]

Circuit Court, D. Rhode Island. June Term, 1823.[2]

[1] [Reported by William P. Mason, Esq.]
[2] [Modified in 12 Wheat. (25 U. S.) 498.]

Webster,` Hazard, and Bridgham, for plaintiffs.

Hunter and Searle, for defendants.

STORY, Circuit Justice. This cause has un-
dergone so able a discussion, and the author-
ities bearing upon the points in controversy
have been so diligently collected, that the

labor of the court has been materially diminished. My own researches have not added much to the mass of learning brought forth from the books; and if, in deciding this case, I do not enter into a minute commentary upon all the authorities, it is because full explanations have been already given of most of them at the bar; and because, after all, the principles, upon which the case must stand or fall, lie in a narrow compass.

The first question, and upon which the cause mainly hinges, is, whether, by the devise to Ezekiel W. Gardner, the debts of the testator are a charge upon the Ferry estate, or a mere personal charge upon the devisee himself. If the latter, then the present suit, supposing it free from all other difficulties, can be maintined only against the devisee, and must be dismissed as against Potter, the other defendant, who claims it by a purchase. If, on the other hand, the debts are a charge upon the estate, the lands, or the purchase money in the possession of Potter, may be reached, unless he can protect himself by some of the doctrines that have been urged in his defence. My opinion is, that the debts are clearly a charge upon the estate. I do not mean by this to say, that the devisee himself is not personally bound by his acceptance of the estate to pay the debts; for I have no doubt he is. But the estate is also charged with the payment, and may be reached in the hands of the devisee, or any person claiming under him, who does not stand in the situation of a bona fide purchaser for a valuable consideration, who has paid the purchase money. The terms of the devise are, in my judgment, as strong as if there had been an express charge upon the estate. The testator devises the estate to his son Ezekiel, "he paying all my just debts out of the estate;" and in another part he expressly orders his son Ezekiel to "pay all his just debts out of the estate therein given him." The estate is not given to the devisee upon the condition generally, that he shall pay the debts; but it is pointed out expressly as the fund, out of which payment is to be made. And the testator having disposed of all his other estate, real and personal, to other persons, his intention to relieve them from the burden would be manifestly defeated, if the court were to reject the plain meaning of the words, and to declare, that though the testator has appropriated a particular fund to the payment of his debts, that fund shall be held discharged from them. The argument of the defendant's counsel seems founded upon this position, that if the devisee himself is personally chargeable, that establishes, that the estate also is not charged. But this conclusion is utterly inadmissible. It is unfounded in principle, and the current of authorities is irresistibly against it. There is a very numerous class of cases, most of which have been cited at the bar, where an estate devised in terms, which would otherwise have been construed to give a life estate only, has been held a fee, upon the ground, that there was a charge for the payment of debts, legacies, &c. for which the devisee was personally liable.

The general doctrine, etablished in these cases, is this, that if the charge is upon the estate only, and there are no words of limitation, the devisee takes an estate for life; but if the devisee is personally chargeable in respect to the estate in his hands, he takes a fee. See cases collected in Cruise, Dig. tit. "Devise," c. 11, §§ 40, 50, et seq; Id. c. 13, §§ 25, 29. Whatever difficulty there may be in reconciling all the cases, there is no diversity as to the principle. The only conflict is in the application of it to particular cases. In some of the cases the charge is merely upon the person of the devisee; as in Collier's Case, 6 Coke, 16, where the devise was to A, he paying to one 20s. and to others small sums, amounting in all to 45s. and it was adjudged a fee simple. So in Doe v. Holmes, 8 Term R. 1 (see, also, Salmon v. Denham, 1 Comyn, 323), where the devise was of a freehold house and furniture to A, "whom I make my executrix, &c. she paying all my just debts, funeral expenses, and legacies," it was held, that A took a fee. But in by far the largest number of the cases the estate was clearly charged with the debts, &c.; and the only question was, whether the devisee was also personally charged. The observations of Lord Kenyon, in Doe v. Richards, 3 Term R. 356, and Denn v. Mellor, 5 Term R. 558, 2 Bos. & P. 247 (see, also, Merson v. Blackmore, 2 Atk. 341; Doe v. Allen, 8 Term R. 497), evince, in the most satisfactory manner, his opinion on the subject. His language in both cases shows, that he understood, that in the former there was a clear charge upon the land; and adverting to the terms of the devise in the same case, "any legacies and funeral expenses being thereout paid," he says, in Denn v. Mellor, that these words imported, that those sums were to be paid by the devisee out of the interest given to her; and if she had died immediately after the devisor, and had only taken a life estate, the fund, out of which she was to bear those charges, might have failed. In Doe v. Snelling, 5 East, 87 (and see Goodtitle v. Maddern, 4 East, 496), where the devise was to A, &c. all the testator's lands, &c. "after having thereout first paid and discharged all my debts and funeral expenses, also subject to the payment thereout all the aforesaid legacies," and it was held a fee in A, Lord Ellenborough said, that the construction of the devise was, that "the payment thereout was to be made by the devisees, and the word, 'thereout,' means out of the property before given to the devisees;" and he added, that where debts or annuities are to be paid "by the devisee at all events out of the estate in his hands, the devisee must take a fee, otherwise the charge might be greater than the estate devised, and he would be a loser." Mr. Justice Lawrence is still more explicit.

After stating, that where an indefinite estate is given to a person in lands, and that person is charged with the debts and legacies, he must take a fee (thus putting a case of a mere personal charge only,) he puts the very case now in controversy, and says, "It is the same thing, if such indefinite estate be given to one, and the debts are to be paid out of the estate given to the devisee; he must there also take the fee; for otherwise the estate may not be sufficient to pay the debt." Mr. Justice Le Blanc sums up the whole doctrine in a more precise manner. His language is, "According to all the determinations, the question, whether the devisee takes the fee or not, in respect of charges, must depend on this, whether he personally, or the estate given to him, be charged with the payment of debts; or whether the estate be given after payment of debts. If the devisee be personally charged with the payment of debts, or if the debts be charged on the quantum of estate given to the devisee, he must take the fee; otherwise, if he only take for life, he may be a loser, or the estate may be insufficient." In the case of Denn v. Mellor, in error before the house of lords (2 Bos. & P. 247), Lord Chief Baron MacDonald, in delivering the judgment of all the judges, alluding to the terms of the devise in that case, (which had been held in the king's bench to pass a life estate only,) said, "If these words are considered as charging the lands in the hands of the widow, in that case according to established principles she would take a fee, as she might otherwise be a loser by the devise;" which is a positive and authoritative declaration of the doctrine. He goes on to state, "that he formerly held an opinion, that the words of charge in this will were a charge on the lands in the hands of the devisee," and that he was "unable to distinguish the difference between devising lands to any one after paying his legacies, and his legacies being paid thereout. In both cases they are to be paid out of the land, which is the subject of the devise. A devise to an individual after paying debts seemed to him to mark the same intent of charging the lands in the hands of the devisee, as a devise to an individual, the testator's debts being paid out of the land devised. He concluded, however, by admitting the distinction, upon the weight of authority. See Goodtitle v. Maddern, 4 East, 496.

The case of Doe v. Clarke, 5 Bos. & P. 343, affords a still stronger illustration of the doctrine. The devise there was of several portions of the testator's real estate to different devisees, and the testator concluded thus: "And I charge all my estates, both real and personal, with the payment of the above as aforementioned legacies;" and it was held, that the devisees took estates for life only, because the charge was upon the estates only, and not upon the devisee. Sir James Mansfield, in delivering the opinion of the court, adverted to and disputed the doctrine of Lord Ellenborough, in Doe v. Snelling, 5 East, 87, who, he said, seemed "to think, that if debts and legacies are to be paid out of the estate at all events, there the devisee must take a fee. But what difference does it make, whether the testator directs the legacies to be paid out of the estate, or to be paid by the devisee out of the estate? In either case can the devisee be a loser, which is the only principle upon which a fee is given him." As to the value of this criticism upon Lord Ellenborough's opinion, I am not called upon to decide. But I quote the following words, standing in immediate connection with the former, to show the learned chief justice's own opinion (and he was an eminent chancery lawyer) on the point we are now considering. "To consider," said he, "such a charge as a personal charge is most extraordinary, since there can be no doubt, that if such devisee were to die before the testator, it would still be a charge upon the estate. That has been decided repeatedly in the court of chancery; and it is quite established, that the charge exists as a charge upon the estate, notwithstanding the death of the devisee in the lifetime of the testator." If we advert to the fact, that these comments were made in a case, where the charge was created by the direction, that the debts, &c. be paid "thereout," that is, out of the estate devised, it seems impossible to misunderstand the meaning of the language. In the very late case of Roe v. Daw, 3 Maule & S. 518, where the devise was to A, B, and C, "except £20 to be paid out of C's part of the lands to B," it was held that C took an estate for life only. Lord Ellenborough said, "It has been contended, that this is a charge to be paid out of the land, and therefore a fee shall pass; and I agree, if it be a charge to be paid out of the lands in the hands of the devisee, the argument is good." Mr. Justice Le Blanc said, "Where there is a devise of lands, generally without words of limitation, it will convey only a life estate, unless it be accompanied with a charge on the devisee, or on the lands in his hands." Mr. Justice Bailey said, "I agree to the rule, that unless there be words of limitation to denote the quantum of interest, or to charge the devisee, or the lands in the hands of devisee, a fee does not pass. That I consider as determined in Moor v. Denn, 2 Bos. & P. 247, and many other cases, and particularly in Doe v. C'a ke, 5 Bos. & P. 343, where, though the legacies were charged on the land, yet it was held clearly not an estate in fee. In this case I find nothing to make the £20 a charge on C, the devisee, or on the lands in her hands; but it is a charge on the lands in whatever hands they may be. The words neither import a charge on the person, nor on the interest, which she takes."

It seems to me therefore demonstrated, so far as the language or authorities can go, that a charge may be personal on the devisee

in respect to the estate, and that it may also, if apt words are used, be a charge upon the estate; and that, wherever the testator points out the fund of payment, a charge is created on that fund. The cases of Boddeley v. Leppingwell, 3 Burrows, 1533; Frogmorton v. Holyday, Id. 1618; Doe v. Holmes, 8 Term R. 1; Goodtitle v. Maddern, 4 East, 498; Andrew v. Southouse, 5 Term R. 292, which have been relied upon to shake this doctrine, all manifestly support it. They are explained by simply adverting to the qualifications of the general rule laid down in the cases already cited, and have been fully answered at the bar.

But it is argued, that all these were cases where the question was, whether the devisee took an estate for life, or a fee; and that no question arose as to the point, whether the estate was also charged; and that in the case now before the court, Ezekiel, by the very terms of the devise, takes a fee. This is true; but it is also true, that in all these cases no question could have arisen as to the fee, unless the debts were a charge on the estate; and that in every instance where it was decided, that, notwithstanding the charge on the estate, the devisee took a fee. it was necessarily decided, that the charge bound the person as well as the estate. It would be the most extravagant rashness to presume that the whole bar and bench, during so many controversies, should have discussed this question, and admitted the charge, as a' charge on the estate, and yet none in reality have existed. But the doctrine is also entirely settled in equity, even in cases where, by the terms of the will, the devisee takes a fee, that if debts and legacies are payable by the devisee out of the estate, they are a charge upon the property. That was the decision in Miles v. Leigh, 1 Atk. 573; s. c. 4 Vin. Abr. tit. "Charge," D 463, pl. 21. There was no doubt in that case, but the devisee took a fee; and the only question was, whether it was a charge on the land. Lord Hardwicke said, "It is objected, that it is not said to be paid out of the estate. &c. nor is it said. by whom it is to be paid; but there are many cases, where it is neither said to be paid out of the estate, nor by whom; yet it has been considered as a charge upon the estate. where the general intent of the testator appeared." "The testator intended it should come out of both estates, and he has charged his son in respect of the whole estate he was to have;" and he affirmed the decree of the master of the rolls, which directed the defendant to pay what should be found due, or in default, to account for the rents of the land. and the land to be sold. Clowdsley v. Pelham. 1 Vern. 411, pl. 386 (and see cases cited Vin. Abr. "Charge," and 1 Mad. Ch. Pr. 474–488; King v. Denison, 1 Ves. & B. 260; Newman v. Kent, 1 Mer. 240; Cary v. Cary, 2 Schoales & L. 173–188). is a strong case to the same effect. But it

cannot be necessary to multiply authorities. It is plain from the language of Lord Hardwicke, that where debts &c. are payable out of an estate, they are a charge upon the estate. This is the common sense of the words of the present will; and if we assume any other construction, we must strike from the will the words "out of the said estate," which no court can be justified in doing without necessity, and more especially, when it would defeat the obvious intention of the testator. I know not a single authority, that sustains the argument, that words like the present do not fix a charge on the estate. None has been cited on the present occasion. On the other hand, there are a series of authorities recognising the charge on the estate in cases of this nature; and it is difficult to turn to a decision, where the subject is before the court, that does not contain a direct or implied admission of the existence of the doctrine. In many instances indeed a charge has been created by implication from words and intentions far less significantly expressed. See Noel v. Weston, 2 Ves. & B. 269; Shallcross v. Finden, 3 Ves. 738. I agree that a mere charge is no legal interest. It is not a devise to any one; but as was observed by the lord chancellor, in Bailey v. Ekins, 7 Ves. 319, 323, it is "that declaration of intention, upon which a court of equity will fasten, and by virtue of which they will draw out of the mass going to the heir, or to others, that quantum of interest, which will be sufficient for the debts." Even as long ago as Lord Holt's time, that eminent judge declared, where a legacy was devised out of the testator's land, that it ought to be paid out of the land, for it was a charge on the land. Anon., 12 Mod. 242, pl. 586. The cases of Livingston v. Livingston's Ex'rs, 3 Johns. 189; Jackson v. Harris, 8 Johns. 109; Jackson v. Bull, 10 Johns. 148: and Jackson v. Martin, 18 Johns. 31,—decided by the supreme court of New York, do not, in the slightest manner, disturb any of these principles: but, as far as they go, confirm them; and the last case particularly contains an implied admission of the very point now under consideration. I have taken up more time than may be thought necessary in considering this question; but the earnestness and ingenuity, with which it has been argued, required some exposition of the grounds, upon which I hold the debts by the terms of the present devise to be a plain charge upon the estate.

It has been argued, that there is something in the peculiar jurisprudence of Rhode Island. which repels this conclusion, or at least prevents its application to the case now before the court. But I am not able to perceive any sound reason for such an opinion. By a statute of this state, the real estate of the testator is made generally chargeable with his debts, upon a deficiency of the personal assets; and the executor may, upon proper application and proof, obtain a license

from the proper court to sell so much of the real estate, as may be necessary to meet such deficiency. But this statute creates a general charge only in favor of the creditors. It does not prohibit the testator from making a particular provision or appropriating a particular fund exclusively for the payment of his debts, which shall bind his heirs and devisees. It does not in the slightest degree interfere with the ordinary construction of wills. It leaves the testator at full liberty to dispose of his property upon such conditions, as he may please, and liable to such charges, as he may please. And when he creates a particular fund for the payment of his debts, and exonerates all the rest of his estate from the charge, as to all other persons except his creditors, that fund becomes exclusively appropriated for the purpose, as much so, as if he had devised it on the special trust. Unless therefore the court were prepared to declare, that the statute overturns all the general rights of testators on this subject, a proposition too extravagant to be maintained for a moment, it is clear that the general liability of the real estate to the payment of debts, created by operation of law, does not destroy the specific charge of the same debts upon the Ferry estate devised to Ezekiel.

This being so, the next question is, whether the land itself in the hands of the other defendant, Potter, or the purchase money now due, remains chargeable with the debts. The argument is, that Potter is a bona fide purchaser, for a valuable consideration, and as such, he takes the estate discharged from the debts, and is not bound to look to the application of the purchase money, even if he had notice of the charge, and the nonpayment of the debts. As to notice, it is quite clear, as well upon the answer of Potter, as the circumstances of the case, that he had absolute notice of the devise to Ezekiel, and that it stood charged with the payment of his father's debts, before the asserted purchase. I do not say, that he had merely constructive notice, knowing that the Ferry estate was his father's, and that the son derived it from him by devise, which would be sufficient to put him upon inquiry, and bind him to take notice; but in point of fact he had seen the will, known its provisions, and the opinions of counsel respecting the nature of the devise, at least as early as the time, when he made his purchase; and according to his own confessions he had notice of the material parts of the will at an antecedent period. But notice is of no importance in a case of this nature, unless the purchaser is bound to look to the application of the purchase money. As to this the settled distinction is, that if a trust is created for specific or scheduled debts, the purchaser is bound to see to the application of the purchase money. But if the trust is for the payment of debts generally the purchaser is not bound to see to the application of the purchase money; and if he pays it over to the trustee, he, and the estate in his hands, stand discharged from the trust. But if the purchase money is unpaid, so much of it, as is necessary, may be reached in the hands of the purchaser to execute the trust. The question then arises, whether in this respect there is any difference between a trust created to pay debts generally, and a charge upon lands for the same purpose. There is an anonymous case in Moseley's Reports (page 96), where a distinction seems to be taken between a trust to pay debts, and a charge for the same purpose. It purports to have been decided by Sir Joseph Jekyll, and is thus stated: "If an estate is devised to trustees to be sold for payment of debts, the purchaser need not concern himself to see the money applied; but it is otherwise, if the debts are particularly specified; but if lands are charged with the payment of debts and legacies, the estate remains charged in whosesoever hands it comes." From this brief note it is not perhaps easy to decide what the real meaning of the latter clause is; whether, that the charge being legacies, as well as debts, the purchaser must look to the application of the purchase money,—a doctrine that cannot now be maintained (Jebb v. Abbott, Butler's note to Co. Litt. 290b, § 12; s. c. cited 1 Brown, Ch. 186, note; Rogers v. Skillicorne, Amb. 188); or whether it means to take a distinction (as seems more probable) between a trust and a charge. If the latter be the true meaning, that case is in conflict with subsequent decisions. In Elliot v. Merryman, Barnard. Ch. 78, 2 Atk. 41, where the debts were by the will charged upon the real estate without the intervention of any trustee, and the bill was brought by creditors against the purchasers of the land to obtain their debts out of the land, the bill was dismissed by the master of the rolls, upon the ground, that the purchasers were not bound to see the money rightly applied; and he denied, that there was any distinction between a trust to sell and a charge for payment of debts. And the like opinion was manifestly held by Lord Camden, in Walker v. Smalwood, Amb. 676; and in Jenkins v. Hiles, 6 Ves. 654, note a, Lord Eldon observed, "that it was long settled, that where a man by deed or will charges or orders an estate to be sold for payment of debts generally, and then makes specific dispositions, the purchaser is not bound to see to the application." Mr. Sugden (Sugd. Vend., Ed. 1818, p. 441, c. 11, art. 11, § 1. Mr. Patch holds the same opinion. Patch, Mortg. art. 11, § 1, p. 404), upon the authority of these cases, does not hesitate to affirm the same doctrine, and holds it equally strong upon principle. The same may be collected to be the opinion of Mr. Fonblanque (2 Fonbl. Eq. c. 6, § 2, note k, p. 149); and if I rightly understand the state of the facts (very imperfectly reported) in Beynon v. Gollins [2 Brown, Ch. 323] (compare that case as cited

in Butler's note to Co. Litt. 290b, § 14, and 1 Brown, Ch. 186, note, and as reported in another point in 2 Brown, Ch. 323), that was also the determination of Lord Thurlow.

Looking to the principle, upon which the general doctrine is founded, I am not able to perceive any material difference between a direct trust to pay debts and a charge upon the lands for the same purpose. The one is a trust fastened upon the estate by a court of equity by implication to effectuate the intent of the testator. The other is a direct trust created by the testator for the same object. And there is great force in the observation, that the mode, by which the trust is created, cannot be material; for if it comes in esse, it is substantially to be executed in the same manner. Sugd. Vend. (Ed. 1818) p. 441, c. 11, art. 11, § 1. Lord Eldon indeed, on a recent occasion, said, "There is a great difference here between a devise upon trust, and a devise subject to a charge;" but he alluded, as the context shows, not to any difference in the effect of the ·lien, or charge, as to creditors, but to the nature of the interest taken by the devisee, whether beneficial, or a mere naked trust. And he added, that "the object is effected much in the same way, compelling the party to make good the charge, or trust, by very similar operations, as applied in this court." King v. Denison, 1 Ves. & B. 261, 272, 276. No authority has been cited, which establishes any distinction between the case of a trust and a charge as to seeing to the application of the purchase money; and my own researches have not enabled me to discover any, except those already referred to. I cannot but think, that the current of authority and the analogy of the law, ought to lead us to a rejection of any such distinction, as unsatisfactory in principle and inconvenient in practice.

But the most material question yet remains to be discussed; and that is, whether Mr. Potter stands in the predicament of a bona fide purchaser for a valuable consideration. It is very clear, that he has not yet paid a very considerable proportion of the purchase money; and if the whole purchase money be not paid, nothing is better settled than, that what remains, may be reached in the hands of the purchaser, to discharge the original trust, unless other equities intervene. And there is a still more salutary principle established by incontrovertible authority, viz. that, though a person, being a real purchaser, ·is not bound to see to the application of the purchase money, if he has bona fide paid it; yet he is not permitted to become a party to any misapplication of the fund, or knowingly to assist in diverting it to his own interest, as in payment of debts due to himself, and then to insist upon the protection of a bona fide purchaser. Even in respect to executors, who, as to personal assets, have a very large authority, but are deemed, in equity, trustees for creditors, legatees, and distributees, it is now clearly settled, that it is a misapplication of the assets to apply them to the payment of the antecedent debt of the executors; and a court of equity will reach them, as trust property, in the hands of any persons, who, knowing them to be assets, have so received them from the executors. There are numerous cases on this subject; and the doctrine was fully discussed in Hill v. Simpson, 7 Ves. 152, and McLeod v. Drummond, 17 Ves. 152, and Bonney v. Ridgard, 1 Cox, 145. But I may well be spared any examination of the cases, since the doctrine has been recently recognised in its fullest extent by the supreme court of the United States. Wormley v. Wormley, 8 Wheat. [21 U. S.] 421. See, also, Adair v. Shaw, 1 Schoales & L. 243, 262.

It becomes material then to sift the particulars of the purchase made by Mr. Potter of the estate in question; and if it shall then appear, that he has been knowingly a party to the misapplication of the trust fund, the court is bound to apply the principles of equity to the case, whatever may be its own private opinion as to the general fairness of the transaction. And I take upon myself to assert, that the imputations in the bill of positive and actual fraud, by Mr. Potter, are not sustained by the evidence. His own answer explicitly denies it; and the other evidence falls far short of establishing any meditated contrivance to cheat the heirs or creditors. Still, however, if the transaction be one, which the law deems incorrect, and admonishes the court to repudiate, as inconsistent with well considered and salutary principles, it is its duty to declare it, and grant the parties an adequate· relief. As to the principal facts there does not seem to be any real controversy. It may be gathered from the evidence, that Ezekiel, the devisee, towards the close of his father's life, was in indigent, if not embarrassed, circumstances, owing considerable debts, and among others a debt exceeding three thousand dollars to Mr. Potter. It is apparent also from the answer of the latter, that he was uneasy about his debts, and looked principally, if not entirely, to the bounty of the father for the means, by which it should be paid. Indeed, there is an irresistible implication throughout the whole record, that the son possessed no substantial means of discharging his debts except the Ferry farm devised to him, and ·a debt asserted to be due from his father, which was controverted and disallowed by the commissioners; and at all events became extinguished in equity by the acceptance of that estate upon the terms of the will. The actual situation of the son and the unascertained state of the debts of the father were fully known to Mr. Potter, and are not even pretended to be denied in the answer. In fact, Mr. Potter puts his chief reliance upon a defence springing from other sources; upon the estate's not being legally charged with the debts, and upon the purchaser's being exonerated from looking to the application of the purchase money.

In this posture of Ezekiel's affairs, Mr. Potter, in April, 1819, about one year after the testator's death, became the ostensible or real purchaser of the whole Ferry farm, and also of a lot of ten acres of land in Jamestown, for the asserted consideration of $15,800. To enable him to make this sale, Ezekiel purchased of his sister Isabel, one third of the Ferry farm and the lot in Jamestown, which had been devised to her by her father; and the value of the lot was, in the sale to Mr. Potter, estimated at $800, and the value of the third of the Ferry farm at $5,000. Neither of those sums has ever been paid to his sister, but it is admitted they both still remain due. The asserted consideration for the purchase of the two thirds of the Ferry farm devised to Ezekiel was therefore $10,000. The terms of the sale were somewhat extraordinary, as they are now stated by the parties. Mr. Potter was to advance the sum of $6,000 towards the payment of Ezekiel's debts, including that of Mr. Potter, and was to reserve the payment of the residue of the purchase money by a note payable on the 25th of March, 1822, without interest. In the mean time Mr. Potter was to be allowed interest upon all the advances made by him. In addition to this, Ezekiel was to have a lease of the whole estate for three years, commencing on the 25th of March, preceding the sale, and of course to end on the 25th of March, 1822, he paying a yearly rent of $948, which was equal to six per cent. upon the purchase money, and was estimated as the fair value of the rent of the estate. It was further agreed, that if Ezekiel could at any time within the three years sell the estate for a larger sum than $15,000, he should have the benefit of the surplus, after deducting all repairs and expenses, which might have been incurred on account of the estate. I observe, also, that it is stated in the answer, that the lease for three years was agreed to be allowed in lieu of interest upon the purchase money, and Ezekiel, in his original answer, asserts, that no rent was in fact to be paid, and that an acknowledgment of the receipt of the same for the whole term was endorsed upon the lease. This assertion is dropped in his second answer, not apparently from mere mistake. In point of fact, upon the original lease (which is annexed to Mr. Potter's answer), there is an indorsement without date, in the following words, "Received the money part of the within lease, it being taken into consideration in the purchase of the within mentioned estate. Elisha Potter." When this endorsement was made does not appear, and it is not in any manner referred to in Mr. Potter's answer. It is an omission somewhat singular if it was made at the time of the execution of the lease, and it constituted a part of the original agreement; and if no rent was in fact to be paid, it is strange, considering Mr. Potter was himself a lawyer, that there should have been inserted in the lease itself. a formal and exact covenant for the payment of the rent annually during the term, a covenant, which was utterly repugnant to the intention of the parties. Indeed I cannot but feel a very strong regret, that the transaction did not originally assume a shape more like the character, which the parties now give it; since the explanations of it are not so satisfactory, or so free from obscurity as to leave no room for hesitation. The reason assigned for taking the lease at all is certainly not very conclusive. It seems, that Ezekiel had previously, in 1818, hired a part of Dutch Island upon a lease of three years (one year of which was expired at the time of the sale of the Ferry farm,) at a small rent, not probably exceeding $70 or $80, and the possession of the lease is made the groundwork of the lease of the Ferry farm for a year beyond the term, at the substantial rent of the whole interest of the purchase money, and with the collateral engagement of Ezekiel to pay interest upon all intermediate advances. But I am content to leave the contract of sale, as it is stated by the parties, without farther observation; and stripped of all disguise, it is in its most favorable view a purchase of the Ferry farm for $15,000, of which $6,000 was to be advanced, or applied to the payment of the debts of Ezekiel, the residue of the purchase money (which was ultimately fixed at $8,800,) was to stand on a credit of three years without interest, and Mr. Potter was to receive interest upon all his advances in the intermediate period. I lay out of consideration the purchase of the Jamestown lot, and one third of the Ferry farm from Isabel, because they were never paid for, and added nothing substantially to the funds of Ezekiel, and do not constitute any part of the fund for the payment of the father's debts.

Here then we have a case, where the trust fund, for the payment of the father's debts, valued by the parties at $10,000. at the very time when the amount of those debts was in course of being judicially ascertained, and before it was actually ascertained, was applied to the exclusive discharge of the debts of the devisee. The father's debts were a known charge upon the estate, and the purchaser knowingly assisted the devisee, who, as to his charge, was also a trustee, to dispose of this estate in payment of his own debts, without in any shape providing for the principal charge. The surplus, after that charge was satisfied, was all that belonged to the devisee; and yet the purchaser assisted the devisee in misapplying the fund, in the first instance, to other purposes. The father's debts have been since ascertained to be about $7,400, not one cent of which has ever been paid by the devisee; and no part of the purchase money, as will be presently seen, has ever come to the hands of the devisee to enable him to discharge those debts. And all this transaction was negotiated and consummated between the parties, with the will before them, upon full deliberation, un-

der their own exposition of the law, and upon the suggestion, that the purchaser was not bound to look to the application of the purchase money.

I agree to the doctrine, in cases of a general charge of debts, that the purchaser need not look to the application, if he has bona fide paid the same. When he has once, in good faith, paid it into the hands of the devisee, he is exonerated. But he is not at liberty to assist in its misapplication; he is not to buy the trust property in payment of antecedent debts, or to aid the devisee in diverting the fund from its proper uses; and if he does, a court of equity will fasten on the estate in his hands the original charge, which he has attempted to displace. It appears, in point of fact, that a sum a little short of $6,000 of the purchase money was, with Mr. Potter's assent. applied to the payment of Ezekiel's own debts, and of this sum more than one half went to extinguish a debt due to himself. But it is necessary to trace the transaction somewhat farther, in order to show, that the parties have always acted with the utmost indifference as to the rights of the father's creditors, and have sheltered themselves, under a supposed rule of law, for any misapplication of the fund. In June, 1820. Ezekiel, notwithstanding the relief already afforded him, was again pressed for some debts. He had then in his possession the note for the purchase money of $8.801. It was then agreed, that Mr. Potter should advance a farther sum to Ezekiel to pay his debts; that Ezekiel should surrender the right of selling the estate for more than $15,-000, retained by the former bargain; that the note of $8,801 should be given up; and that the sum which, on a settlement, should be found due to Ezekiel, should be secured to be paid to him on the 25th of March, 1822, partly by a cash note, and partly by a note payable "in mortgages in the town of South Kingston, or in the state of New York." Accordingly Mr. Potter paid to Ezekiel's creditors, by his own notes about $3,705. and Ezekiel gave up the right of reselling the estate, and also the cash note of $8,801. Mr. Potter ascertained his advances, together with interest, to be $7,070.38, leaving a balance due from the purchase of the estate, of $7.929.62. For this last sum Mr. Potter gave two notes antedated as of the 25th of March, one a negotiable cash note for $4,000, the other a note for $3,929.62, payable to Ezekiel, or order. on the 25th of March, 1822, "in mortgages in the town of South Kingston, or in the state of New York." It is not my duty to comment on the wisdom or policy of such an extraordinary bargain, so far as it respects the pecuniary interests of the devisee. It does indeed seem to me utterly unaccountable, how a bargain so indefinite in some of its terms and objects, and so little suited to the exigency of his embarrassed situation, should have received the deliberate assent of the devisee. A readier scheme to

disable him from the present means of discharging his debts, without great sacrifices, could have hardly been imagined.

The original note was negotiable, and capable of being turned into cash at any time at a reasonable discount; but by the exchange, nearly a moiety of the amount was invested in a security, not only not negotiable, but so loose in its terms and obligation, that its real value was incapable of any exact appreciation. It appears, also from the answer of the devisee, that the negotiable note of $4,000 was immediately indorsed over to his sister Isabel, and an assignment also made of $1,800, part of the other note, by way of payment, or security, for the estate bought of her by the devisee. And this arrangement was most probably contemplated by all the parties, when the negotiation, in June, 1820, was first entered into. It will at once be perceived, that deducting the amount thus justly secured to Isabel, the whole of the purchase money was exhausted excepting about $2,000; and the latter sum was locked up in undefined mortgages in South Kingston or New York. So that the whole trust fund was in effect gone from the reach of the creditors. the greater part being applied to the extinguishment of Ezekiel's own debts; and what remained was appropriated to other purposes. The very tenor of the note for the mortgages was calculated to embarrass, if not to defeat, any chance for redress; for the option, as to what mortgages should be taken or received, belonged to the parties, and could not be very easily, if at all, exercised by the creditors or strangers. The transaction was about the time, when the commissioners made their report of the father's debts to the court of probate; and as all the parties lived in South Kingston, the amount must have been in a great measure previously ascertained, and could scarcely have escaped the inquiry or attention of any persons interested in the estate. There is, beside, the still stronger fact, that controversies had then arisen between the plaintiffs and the devisee in respect to this very matter; and a suit was avowedly in contemplation to ascertain and adjust their respective rights. To no person was this better known than to Mr. Potter. Now, when he had notice of the non-payment of the debts, and of the application to the devisee to have them paid, of the negotiations for the purpose of an amicable settlement, and of the failure to accomplish that object, he was put upon legal notice and inquiry: and he could not farther negotiate with Ezekiel, in respect to the funds then in his hands, without being liable to have his proceedings scrutinized in a court of equity. There is much other matter in the case, which is open to observation; but the conclusion, to which the court has arrived, renders any discussion of it unnecessary. That conclusion is, that the sale by the devisee, under the circumstances, was a manifest breach of trust, in violation of his

duty to the creditors, and subversive of the great object of the testator in the devise in question.

The next consideration is, whether Mr. Potter was conusant of this breach of trust, and, upon the facts already stated, it seems beyond all doubt, that he had full knowledge of the breach, was a party to it, and voluntarily assisted in the misapplication of the purchase money. He can shelter himself from responsibility in a court of equity only by showing himself to be a bona fide purchaser, who has not aided in such misapplication. In no proper sense can he be considered as such a purchaser. He has chosen to apply the purchase money, so far as it has yet been paid, or liquidated, to the exclusive payment of the devisee's debts, and not of the debts of the testator. In this way he has been privy to the expenditure and appropriation of nearly $8,000, according to his own account of the matter; and, as to the residue of the purchase money, so far from paying it to the devisee, or applying it to the discharge of the testator's debts, he has aided in closing it up in mortgages of an undefined nature, and thus precluded it from being applied as a present fund for the purposes of the trust. Unless the court, therefore, is ready to surrender its duty, it can have no difficulty in holding, that the Ferry farm, to the extent of the estate devised to Ezekiel, remains still charged and chargeable, in the hands of Mr. Potter, with the debts of the testator. I had some doubt, originally, whether Isabel, the daughter of the testator, ought not to have been made a party to the bill, since, according to the allegations in the answer, she has an interest in the outstanding purchase money for the debt due to her. But I am now entirely satisfied, that she is no necessary party to the bill. No decree can be made against her. She is no party to the asserted breach of trust; and has no interest, which can be affected by any decree between the present parties. If she has any lien on the estate for the unpaid purchase money, it is only upon that part of it, which was conveyed by her. As to her interest in any of the notes, the court will do nothing that can disturb her rights; it will act altogether upon that portion of the estate and purchase money, which does not interfere with her claims.

Having stated these results, it remains only to advert to the objection, that the present plaintiffs are not competent to maintain the present suit, because they have not yet paid the testator's debts. The argument is, that the creditors alone have a right to maintain a suit to enforce the charge, unless they have been paid by the executrix or the devisees. The right of the creditors to enforce the charge in equity cannot be doubted. See Green v. Lowes, 3 Brown, Ch. 218. But I am also of opinion that the executrix, who, by the law of the state, is responsible for the payment of the debts, where there are real or personal assets, has also a right to enforce the charge. She might procure a license from the proper authority to sell the real estate, upon a deficiency of the personal assets, pursuant to the statute. She might in this way, perhaps, reach the estate charged with the debts; but the remedy would be circuitous, and might be inadequate to all the purposes of equity. She is not compellable to adopt that course; but may directly, by the assistance of a court of equity, reach the fund, which, in the eyes of such a court, is appropriated for the payment of the debts. If she can do this after payment of the debts, there is no reason why she may not do it before, since she is entitled to avert an impending mischief, and is not bound to advance her own money to pay the creditors. Besides, the testator has disposed of all his real and personal estate by his will, and the executrix, who is residuary legatee and devisee, has no right to apply the personal estate, bequeathed to other legatees, to the payment of the debts, when there are other funds appropriated for the purpose; and she has a direct interest to relieve property devised to herself from the burden of the debts. The like remark equally applies to the other plaintiffs, who are devisees exonerated by the will from any contribution or lien. I entertain no doubt, therefore, that the plaintiffs are competent to maintain the present suit. It is the common case of a party subjected to a burden chargeable upon her in law; but from which she is entitled to be relieved in equity, by a paramount obligation on another to exonerate her from the whole burthen. Upon the whole, this is, in my judgment, a clear case for equitable relief, and I shall decree it according to the principles already suggested.